UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                  :
UNITED STATES OF AMERICA                          :
                                                  :
                    -v-                           :            13-CR-934 (JMF)
                                                  :
DORIAN AVERY,                                     :                ORDER
                                                  :
                             Defendant.           :
                                                  :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

On August 3, 2020, the Court received the attached motion from Defendant, proceeding *pro se*, seeking early release in light of the COVID-19 pandemic.  Upon review of the motion, the Court concludes that it would be appropriate to appoint counsel for Defendant pursuant to the Criminal Justice Act ("CJA").  Accordingly, unless and until Defendant objects, James M. Roth — the CJA lawyer on duty today — is appointed to represent Defendant in connection with the motion he filed (and any other application relating to COVID-19).  Mr. Roth shall immediately contact Defendant by telephone to advise him of this Order and confirm that he is willing to be so represented (the alternatives being to continue to proceed *pro se* or to retain counsel), and shall promptly file a letter indicating whether Defendant consents or objects to such representation.

Unless and until the Court orders otherwise, counsel shall file any supplemental papers on Defendant's behalf no later than **August 11, 2020**.  The Government shall file any opposition by **August 18, 2020**, and Defendant shall file any reply by **August 21, 2020**.

SO ORDERED.

Dated: August 4, 2020
New York, New York

_____
JESSE M. FURMAN
United States District Judge

Re: Supplemental Addendum to [Exhibit 1A-E]
To: Honorable Judge J. Furman
From: Dorian Avery 51830-083
Date: July 23, 2020

Honorable Judge Furman,

I am writing in regard to my pro se Motion for Modification and/or Reduction of

my Sentence pursuant to 3582(C)(1)(A). I am in recent receipt of my latest two

attempts to exhaust all of my required Administrative Remedies, which I sent in

along with this letter. Please allow these requests and responses to be entered as

part of my "Administrative Remedies" exhaustion exhibits. [See: Exhibit 1A-E]


Thank you and God Bless.

Dorian Avery
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

**AVERY, Dorian**
Register No. 51830-083
Remedy No. 1033470-F1

## PART B - RESPONSE

This is in response to your Request for Administrative Remedy in
which you appeal the denial of your request for Compassionate
Release/Reduction in Sentence.  As relief, you request to be
granted compassionate release.

In accordance with Program Statement 5050.50, Compassionate
Release/Reduction in Sentence: Procedures for Implementation of
18 U.S.C. §§ 3582 and 4205(g), and 18 U.S.C. 3512(c)(1)(A), an
inmate may initiate a request for consideration only when there
are particularly extraordinary or compelling circumstances,
which could not reasonably have been foreseen by the court at
the time of sentencing.

The BOP has interpreted the extraordinary and compelling
circumstances in a number of categories outlined in policy. BOP
Program Statement No. 5050.50, Compassionate/Reduction in
Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582
(c)(1)(A) and 4205(g), provides guidance on the types of
circumstances that present extraordinary or compelling reasons,
such as the inmate's terminal medical condition; debilitated
medical condition; status as a 'new law' elderly inmate, an
elderly inmate with medical conditions, or an "other elderly
inmate"; the death or incapacitation of the family member
caregiver of the inmate's child: or the incapacitation of the
inmate's spouse or registered partner.

On May 18, 2020, you were denied compassionate release and
instructed to re-submit your request with one of the above-
enumerated categories.  Appealing that decision does not
constitute a new request.  Again, if you still wish to be
considered for Compassionate Release/Reduction in Sentence,
please re-submit your request to the Warden under a specific
category.  Accordingly, your request for compassionate relief is
denied based upon your original request.

If you are dissatisfied with this response, you may appeal to
the Northeast Regional Director, Federal Bureau of Prisons.
Your appeal must be received in the Northeast Regional Office,
U.S. Customs House, 2nd and Chestnut Streets, Philadelphia, PA.
19106, within 20 calendar days of the date of this response.

_____            7/21/20
David E. Ortiz                              Date
Warden

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*JMC 7/16/20*

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Avery Dorian      51830-083    5802    FCI Fort Dix
      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.      UNIT      INSTITUTION

**Part A– INMATE REQUEST** I Am Appealing the denial of my request for compassionate release I am a CDC identified person at high risk for severe illness due to COVID-19, I have a re-entry plan in place that is verifiable, I Am A non-violent offender with over 60% of my time served, this is without taking into account my Good time credit. This Administrative Remedy is my fourth atempt at getting this Institution to Aide me in my quest for compassionate release.

7/16/2020
_____
DATE

Doris A
_____
SIGNATURE OF REQUESTER

**Part B– RESPONSE**

_____
DATE

_____
WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

CASE NUMBER: _____

**ORIGINAL: RETURN TO INMATE**

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____
DATE

_____
RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)

OPI : LEGAL DEPARTMENT

Number : FTD 1330.16

Date : October 1, 2010

Attachment : 1

FCI FORT DIX, NEW JERSEY

INFORMAL RESOLUTION FORM (BP-8)

You are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-229 (old BP-9), you MUST ordinarily attempt to informally resolve your complaint through your Correctional Counselor. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally and state names of staff contacted.

Date form issued and initials of Correctional Counselor: _ML_ _7/9/20_

INMATE NAME _Dorian Avery_

REGISTER NO. _51830-083_

BLDG. _5802_

Date the incident complained of occurred: _____

Complaint and relief requested: _Im appealing the denial of my request for compassionate release I am a CDC identified person at high risk for illness due to Covid-19. I have a re-entry plan in place that is verifiable I am a Non-violent offender with over 60% of my time complete this is without taking into account my Good time Credit._

CORRECTIONAL COUNSELOR

Date BP-8 returned to Correctional Counselor: _____

Efforts made to informally resolve and staff contacted: _____

_____

_____

_____

Date response given to inmate: _____

Date BP-229 (13) Issued: _____

Counselor      (sign)    _____

Unit Manager   (sign)    _____

If complaint is NOT informally resolved: forward original attached to BP-229 (13) form to the Legal Assistant.

RECEIPT - ADMINISTRATIVE REMEDY

DATE: JULY 16, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      FORT DIX FCI

TO : DORIAN AVERY, 51830-083
     FORT DIX FCI     UNT: UNIT 5802     QTR: N02-156L

THIS ACKNOWLEDGES THE RECEIPT OF THE ADMINISTRATIVE REMEDY REQUEST
IDENTIFIED BELOW:

REMEDY ID        : 1033470-F1
DATE RECEIVED    : JULY 16, 2020
RESPONSE DUE     : AUGUST 5, 2020
SUBJECT 1        : REDUCTION-IN-SENTENCE REQUEST
SUBJECT 2        :



Dorian Avery 51830083
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ. 08640

NEW YORK NY 100

28 JUL 2020   PM 11 L

District Court Judge Hon. Jesse M.
Furman
Thurgood Marshall United States
Courthouse
40 Foley Square
New York, NY  10007

10007-150299

United States District Court
Southern District of New York

United States of America
Vs
Dorian Avery
Defendant

Application for modification of sentence
Pursuant to 18 U.S.C.  Section 3582 (c) (1)()(;)
As a result of Covid-19

Dorian Avery # 51830-083
F.C.I. Fort Dix
P.O. Box 2000
Joint Base MDL NJ, 08640

### Pro se supplemental brief

Now comes, Dorian and Avery, proceeding pro se and this application for modification of sentence pro se supplemental brief and so provides the following information to this court for it review and consideration.

### Mr. Avery is proceeding pro-se

Because Mr. Avery is proceeding pro se, this is pleading should be held to less stringent standards then formal papers drafted by lawyers (Haines v. Kerner, 404 US 519, 520 (1972). Furthermore, because Mr. Avery is proceeding pro se, this submission must be read to "raise the strongest argument they suggest "Olie v. Columbia Univ.332 F. Supp 2d. 599, 607 (SDNY 2004), Aff'd 136 F. App'x 383 (2d. Cir. 2005) (citations omitted); 470 are F.3d. 471,474 (2d. Cir. 2006) (observing that pro se litigants must be treated with "special solicitude").

### Jurisdiction

The First Step Act (P.L. 115 – 391), Sec. 603, amended 3582 (c)(1) (A) to permit defendants to move a sentencing Court for Modification of sentence Federal Courts for Modification of sentence. Federal Courts have jurisdiction pursuant to title 28 USC 1331.

### *Administrative Remedies*

Avery assert that a formal request has been made as advised to the proper staff on the institutional level to case manager Vogt. In said request Avery explicitly noted "I would like this request and respond to represent the fool exhaustion of all required administrative remedies due to the time sensitive nature of this matter". Subsequently, case manager Vogt denied Avery's request stating in order to qualify an individual cannot have any history of violence as you have a Violet conviction in your past you do not qualify. [See Exhibit 1A-E]

### *Legal Standard*

Pursuant to 18 U. S. C. Section 3582 (c) (1) (A) (i) a court may modify a term of imprisonment upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of the prisons to bring a motion on the defendant behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant facility, whichever is earlier, may reduce the term of imprisonment... after considering the factors set forth in section 3553 (A) to the extent that they are applicable, if it finds that (i) extraordinary and compelling reasons warrants such a reduction" 18 USC section 3582 (c)(1)(A)(i). "even where [administrative] exhaustion is seemingly mandated by statute or decisional law the requirement is not absolute'. Washington v. Barr, 965 F. 3d.109, 118 (2d. Cir. 219).

Furthermore, "a court may wave an administrative exhaustion requirement where [exhaustion] would be futile... with the administrative process would be incapable of the granting accurate adequate relief. [or] where pursuing Agency review would subject [the person seeking relief] to undo prejudice. Further" undue delay, if it in fact results in catastrophic health consequences" can justify waving and a ministration exhaustion requirement for any of these three reasons" id. At 120-21.Here the Covid-19 I'll outbreak and the unsanitary conditions at Fort Dix that it (FCI) combined with the delay that Avery would experience if Avery had to wait for 30 days to expired before pursuing a motion for comprehensive release as this court would put him at significant risk of suffering catastrophic health consequences justifies waiver.

2

<u>*Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and*</u>

<u>*Compelling Circumstances Exist to Modify Mr. Avery's Sentence and Transfer Him to Home Confinement.*</u>

The Compassionate Release statute, 18 U.S.C. Section 3582(c)(1)(A), serves as an important safety valve in the federal sentencing system. Once a federal sentence becomes final, a number of rules serve to keep the finality of that sentence intact. In some cases, however, circumstances arise that can significantly alter the calculus conducted at the original sentencing or cast doubt on the need for further incarceration. The unprecedented threat of COVID-19 could not have been foreseen at sentencing and poses extraordinary risks to Mr. Avery's health and life. Congress wanted the District Court to have discretion to take another look in appropriate cases, and it did so through enacting the Compassionate Release statute. From the get-go, Congress was clear that it wanted to "keep the sentencing power in the judiciary where it belongs." Sen. Rep. 98-225 at 60, 1983 WL 25404 (Aug. 4, 1983), and so the statute vested decision-making power in the District Court. More to the point, all indications are that Congress would have wanted the Sentencing Court to have that authority. Section 603 of the First Step Act created an unusual precondition.

It bears repeating that the current pandemic does place inmates in danger. A Sentencing Court is in a good position to consider all of the relevant circumstances, such as the most up-to-date information about conditions at a particular facility, the CDC's information about the correlation between a particular health condition, and the vulnerability of a particular ethnic group to death or serious injury from the coronavirus.

In light of the unprecedented nature of this emergency, which results in catastrophic health consequences, Federal Courts have found they can hear Compassionate Release applications prior to the expiration of 30 days if there is an emergency. Eg., United States v. James Arberry, No. 15-cr-594 (JPC) ECF Docket No. 84 (SDNY Nov. 12, 2019) (hearing and granting emergency Compassionate Release application of prisoner). Specifically, Courts across the country and, within this Circuit, have so held on the basis of the COVID-19 pandemic. See; United States v. Perez, 17-cr-513 (AT) (SDNY) ECF No. 98 (April 1, 2020) (finding three exceptions to exhaustion applicable: (1) futility; (2) where the administrative process is incapable of

3

roviding the requested relief; and (3) where the Defendant is subjected to undue prejudice).  See also; United States v. Zukerman, 16-cr-194 (AT) (SDNY) ECF No. 116 (Apr. 3, 2020) (same); United States v. Colvin, No. 18-cr-179, 2020, WL 1613943 at 2 (D. Conn. Apr. 2, 2020).

Moreover, a District Court applies its independent judgment to decide whether to reduce a sentence.  See; United States v. Beck, F. Supp. 3d 2019, WL 1864906 at 13 (MDNC June 28, 2019) ("The terms of the First Step Act give Courts independent authority to grant motions for Compassionate Release Motions").  See also; United States v. Decater, 2020 WL 1676219 at (D. Md. Apr. 6, 2020) (same); United States v. Ebbers, F. Supp. 3d 2020, WL 91399 at N.6 (SDNY Jan. 8, 2020) ("No statute directs the Court to consult the BOP's rules or guidelines ... and no statute delegates authority to the BOP to define the statutory requirements for Compassionate Release").  Congress reformed Section 3582(c)(1)(A) because it wanted Compassionate Release to be a more meaningful vehicle for judicial review of sentences.

Indeed, even "de novo review" is a misnomer.  When a District Court rules on a Compassionate Release Motion, it is not reviewing the BOP's decision.  Instead, it is simply deciding, in the first instance, whether or not a Defendant is entitled to Compassionate Release under the law.  Both the statutory structure, which gives the BOP no role in developing criteria for granting Compassionate Release, and the fact that the District Court is empowered to rule on a Compassionate Release Motion even if the BOP takes no action, make this clear. Allowing Avery to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the rampant spread of the novel coronavirus at FCI Fort Dix, especially given that Avery has already served the vast majority of his sentence.

4

### *Preliminary Statement*

In the midst of the Covid-19 pandemic the prison population stay out as one of the most vulnerable groups according to the [congressional research Service: Federal prisoners and Covid-19 background and authorities to grant release]

"There is concern that Coronavirus disease 2019 (covid-19) could quickly spread among federal prisoners and prison staff because of the prison environment. Prisons or places where hundreds of prisoners and staff are living and working in close proximity to each other and where they are forced to have regular contact. Prisons are generally not conducive to social distancing. Also, prisons infirmaries typically do not have the resources available to most hospitals, such as isolation beds, that would help prevent the spread of disease. There are concern that if prison staff were hard hit by Covid-19, a significant number would of staff would require quarantine, they would be unavailable to perform their duties, including providing care to sick prisoners; and the disease would spread.

In light of the extreme danger posed by Covid-19 Dorian Avery (hereinafter Avery) submit the insert application under 18 U.S.C. Section 3582 (c) (1) (A) (i) to request that the court decrease petitioner's sentence by (12) months combined with (12) months home confinement, which will cause him to be immediately transferred from his present place of confinement at FCI Fort Dix P. O. Box 2000, Joint base MDL, NJ 08640 to home confinement [which is still under the BOP custody and control].

The Federal Correctional Institution, Fort Dix (FCI Fort Dix) is a low – security United States Federal prison for male offenders in New Jersey Fort Dix is the largest single Federal Prison in the United States in the number of inmates housed there.

BOP inmate deaths thus far have occurred at low security prisons and prison camps --- Institutions such as Oakdale, Butner, Elkten and Danbury ---facilities that have dormitory – style housing similar and akin to the living style in FCI Fort Dix where social distancing is impossible.

Avery is presently incarcerated with 2971 of the inmates in a very close quarter. Avery resides in a unit in a dorm-type room with (12) other inmates and there are six bunk bed of 12 inmates per room [See: Exhibit]

5

General population inmate are housed in the building formerly used as military barracks in unhealthy, unsanitary and hazardous conditions that foster the spread of Covid-19. The 350 inmates in the unit share (21) toilets, (9) urinals, and 13 showers. These aforementioned areas are riddled with rust and mold and holes in the walls that exposed Avery to bacteria and germs that spread the Covid-19. [ See: Exhibit 2A-J]

Inmates are issued (1) mask once per week yet are not given gloves to protect their hands from contracting coronavirus via touching high infections touch areas. [ See: Exhibit 3]

If Avery is approved for early home confinement, he will reside at 920 Metcalf Avenue, Apt 10J Bronx, NY. 10473, with his father Carter Avery, Sr. Upon the Courts granting of Avery's motion and ordering his transfer to the above address. Avery's father Carter Avery, Sr will pick Avery up within 1 hour and a half of said ordering being granted.

Although inmates are given disposable surgical mask to wear, which are designed to be used once then thrown away [note: inmates are given (1) mask per week]. The CDC report finds that these disposable surgical masks are not effective in the fight against Covid-19 the Covid-19 can survive for up to (7) days on the surface of those types of mask and when used properly the best preventive mask only reduce the chance of avoiding this disease by 10%.

Nonetheless, Avery wears his mask because the Center for Disease Control and Prevention [CDC] shows that "African–Americans are especially vulnerable to Covid-19", other disease prevention sources report: The Coronavirus is killing Black Americans outsize rates cross the U.S.", "Early data shows African-Americans have contracted and died of Coronavirus at an alarming rate" and "African Americans disproportionately affected by coronavirus, CDC report finds between ages 20-56".

Avery is a Black African American (45) years of age living under conditions that foster the spreading of Covid-19, on all accounts that make him a prime candidate to catch Covid-19.

According to [F bop.gov] "Covid-19 resources page full break down and additional details". There have been (13) inmates and (4) staff that have tested positive for the Covid-19. By the time the Court review this application that number will have significantly increase and Avery hopes and prays not to be one.

6

Since no alcohol is permitted in the facility, there are no alcohol-based hand sanitizers [See: Exhibit 4], while soap is available, the common bathrooms that every inmate is forced to use are not cleaned any more frequently as a result of the pandemic. Inmates are required to use the computers and phones to communicate with family and friends, but neither is cleaned regularly, and inmates are not provided with gloves to protective them from contracting Covid-19 via touching high touch areas.

There is not a separate area in Fort Dix for sick inmates to self-quarantine, so Avery is forced to sleep in a dorm-style housing unit on a bunk bed right next to another inmate and with another inmate on the top bunk (within 3 to 4 feet of him) both of whom may be infected and need of self-quarantine (which is impossible at FCI Fort Dix).

Avery is fearful, that if he has not already contracted Covid-19 by the time this application is filed, he is almost certain to contract it within the next few days unless immediate action is taken. Avery is 45 years of age. The exigency circumstances caused by this deadly virus present extraordinary and compelling reasons to take action.

Accordingly, Avery respectfully requests that the court issue an Order pursuant to 18 USC Section 3582 (c)(1)(A)(i) to decrease Avery's sentence by (12) months combined with (12) months home confinement so he may be immediately transfer to his residence to serve the remaining months of his sentence in home confinement. It may literally save his life and others.

### CDC Newly Revised Guidelines Renders Mr. Avery at a
### Much Higher Susceptibility of Contracting COVID-19

The CDC  Summary of Recent Changes Revisions were made on June 25, 2020, to reflect available data as of May 29, 2020.

The CDC reported, people of any age with the following conditions are at an increased risk of severe illness from COVID-19;  people who are overweight or obese are at higher risk for chronic conditions. Obesity (body mass index [BMI] of 30 or higher): Having obesity, defined as a body mass index of 30 or above, increases your risk of severe illness from COVID-19.

At the time of this writing, July, 2020, Avery had a body mass index of 37.7, making him obese, a condition that presents an increased health risk from COVID-19 infection. It is an undisputable fact that Mr. Avery's obesity places him at a heightened risk of death or severe illness if he contracts COVID-19. On June 25, 2020, the CDC amended its definition of obesity in the context of an increased risk of severe illness from COVID-19 to a BMI of 30 or above. Prior to this date, it was defined as a BMI of 40 or above. Accordingly, Mr. Avery's BMI of 37.7 places him at an increased risk of death or severe illness were he to contract COVID-19.

Moreover, Attorney General William Barr issued a memo which outlined eligibility for early Home Confinement. Barr's memo specified, "An inmate's vulnerability to COVID-19 under Centers for Disease Control and Prevention (CDC) guidelines is to be considered, and inmates that are deemed vulnerable to COVID-19 should receive priority treatment."

Furthermore, regarding vulnerability to COVID-19, the CDC recognized that African-American males are especially vulnerable to COVID-19. The CDC notes that "long-standing systemic health and social inequities have put some members of racial and ethnic minority groups at an increased risk of getting COVID-19, or are experiencing severe illness, regardless of age." [See: CDC Revision Report.]

*The Long-Term Irreversible Effects for COVID-19 Survivors are Detrimental and Life-Shattering ...*
Now physicians warn that COVID-19 survivors may experience long-lasting irreversible effects. In light of these factual findings, Avery asserts and urges this Court to grasp the perspective that "prevention is better than the cure."

According to the [Advisory Board] at (https//www.advisory.com), as of June 2, 2020, as researchers continue to uncover the long list of COVID-19 symptoms, some physicians are beginning to explore the disease's possible long-term effects on patients. Here's what the research shows so far.
Joseph Brennan, a cardiologist at the Yale School of Medicine, and other experts, now worry there may be a subset of patients who suffer long-term damage. For instance, Brennan reports, preliminary research on other coronaviruses, such as Severe Acute Respiratory Syndrome (SARS) and Middle East Respiratory Syndrome (MERS), suggest some people can take years to recover.

8

The research rounds up the most notable, potential long-term health effects that doctors are observing in COVID-19 patients.

## I. [Blood Clotting, Stroke, and Embolisms]

Physicians report that patients hospitalized for COVID-19 are experiencing high rates of blood clots that can cause strokes, heart attacks, lung blockages, and other complications. For instance, physicians are seeing an uptick in strokes among young patients with COVID-19.

The blood clots also can travel to other organs, leading to ongoing health problems. For instance, pulmonary embolisms, which occur when the clots block circulation to the lungs, can cause ongoing "functional limitations," like fatigue, shortness of breath, heart palpitations, and discomfort when performing physical activity. Similarly, blood clots in the kidneys can cause renal failure, which can cause lifelong complications.

## II. [Heart Damage]

Physicians have also reported an increase in inflammation of and damage to the heart muscle in COVID-19 patients. One study published in March found that out of 416 hospitalized COVID-19 patients, 19% showed signs of heart damage. Another study from Wuhan, published in January, found 12% of COVID-19 patients showed signs of cardiovascular damage. Other studies have since found evidence of myocarditis, inflammation of the heart muscle, that can cause scarring and heart failure in COVID-19 patients.

Now physician warn that COVID-19 survivors may experience long-lasting cardiac damage and cardiovascular problems, which could increase their risk for heart attack and stroke. Doctors also warn COVID-19 could worsen existing heart problems.

## III. [Lung Damage]

Research shows some patients are experiencing lung symptoms such as pain and dry cough, weeks after recovering from the virus. Physicians have also found evidence of scarring in COVID-19 patients' lungs. Accordingly, some CT scans show COVID-19 patients have light gray patches on their lungs called "ground-glass opacities," which don't always heal. One Chinese study found patches in 77% of patients.

Brennan explained that the "virus creates an incredibly aggressive immune response" that causes "spaces [in the lungs to be] filled with debris and pus, making your lungs less pliable." According to Brennan, this type of lung damage can e permanent and could result in reduced capacity. "Routine things, like running up a flight of stairs, would leave these individuals gasping for air," he said.

Research shows that about one-third of survivors of similar coronaviruses such as SARS and MERS had long-term lung damage.

### IV. [Neurological Symptoms]

Research shows COVID-19 can also affect the Central Nervous System after patients showed neurological symptoms like headaches, dizziness, loss of taste an smell, and impaired consciousness.

As a result, Mitchell Elkind, President-Elect of the American Heart Association and Professor of Neurology and Epidemiology at Columbia University, said doctors should be "on the lookout for long-term neurocognitive problems," including decreased concentration and memory, as well as dysfunction of the peripheral nerves that lead to the "arms, legs, fingers, and toes."

Avery asserts, that what the numerous experts are discovering now concerning the long-term effects due to one contracting and surviving COVID-19, is just barely the tip-of-the iceberg of irreversible effects. The coronavirus has proven to be an overwhelming force not only for those who have perished due to the pandemic, but also for those who survive this respiratory attack. In light of the irreversible and long-term damage contracting COVID-19 poses, the only humane and sound decision would be to help prevent inmates from contracting the virus in the first place.

As the long-term, irreversible research details, "patients experience lung damage, weeks after recovering from the virus"; "77% of patients have light gray patches on their lungs called 'ground-glass opacities,' which don't always heal"; "this type of lung damage, 'ground-glass opacities,' can be permanent and could result in reduced capacity"; "one-third of survivors of coronavirus ... had long-term lung damage."

Avery notes even the simplest of symptoms such as "headaches, dizziness, and loss of taste and smell," will lead to "long-term neurological problems causing dysfunction in nerves that lead to the arms, legs, fingers, and toes."

10

For the previous set forth facts, modifying Avery's sentence by no more than 30 months pales in comparison to allowing Avery to remain in an environment where contracting the virus is almost certain (if Avery has not already contracted the virus), and spending the next 30 years of his life enduring the long-term irreversible effects COVID-19 survivors have to suffer through.

### *The Pandemic's Adverse Impact on Avery's Potential Eligible Release Date*

Avery was scheduled to be placed in the Residential Drug Abuse Treatment Program (RDAP) on or about March, 2020, pursuant to the Bureau's Drug Abuse Treatment Program for the inmate population (Program Statement 550.53: Residential Drug Abuse Treatment Program [RDAP]).

Avery has previously and successfully participated in and completed the Non-Residential Drug Abuse Treatment Program, which is a required component for drug abuse education.

Pursuant to Program Statement 550.53 (RDAP), Avery was to begin his participation in the RDAP unit-based component of the program in or about March, 2020.  According to the RDAP unit-based component, "Inmates must complete a course of activities provided by the Psychology Services Department in a treatment unit set apart from the general prison population.  This component must last at least six months."  [See: 550.53; Residential Drug Abuse Treatment Program.]

According to RDAP's Community Treatment Services (CTS), "Inmates who have completed the unit-based program and (when appropriate) the follow-up treatment, and transferred to a community-based program, must complete CTS to have successfully completed RDAP and receive incentives [i.e., early release under 18 U.S.C. 3621(e), if applicable]."  [See: 550.53 supra.]

Avery was prohibited and unable to proceed past the beginning stages of RDAP because COVID-19 has suspended regular meetings.

Avery has served over 66% of his sentence, and his projected release date (after his completion of RDAP) would have been in or about December, 2020.  Avery's December, 2020 eligible release date was predicated upon and included the six months the program must last, Avery being transferred to a community-based program (i.e., halfway house for 12 months), and Avery receiving RDAP program incentives (i.e., early release under 18 U.S.C. 3621(e) of 12 months).

11

Avery is a non-violent offender, 46 years of age, who does not pose a danger to society. In ordinary circumstances and in ordinary times, minus and/or absent the coronavirus pandemic, Avery likely would be eligible for release to a Residential Reentry Center (ARC) in the near future.

## *The conditions of (BOP) Fort Dix (FCI) incarceration foster the spread of covid-19 and compels immediate reduction of Avery's sentence to protect him and others from the deadly virus.*

The high risk of contracting Covid-19 due to the conditions of FCI Fort Dix, where Avery is currently housed, compels immediate reduction of his sentence by (12) months combined with (12) months home confinement so that Avery can be immediately transferred to home confinement. The circumstances created by covid-19 present "extraordinary and compelling reasons that warrant such a reduction". 18 USC Section 3582 (c)(1)(A)(i).

As of April 10, 2020, at 6:30am, Covid-19 has infected over 475,873 people in the United States, leading to over 46,785 deaths. By the time the Court review this application that number will have significantly increased. New Jersey is label as an "hot Spot" Yet has not seen the confined cases and death as it sister state New York but New Jersey has over 50 four 1588 confirmed cases with over 1932 deaths.

Fort Dix has had 17 confirmed cases of COVID-19 and there will be many more cases, because it is impossible to have "social distancing" in the cramped quarters [which they are continuing to fill] in which Avery is confined.

In a memo to the inmate population (April 11th, 2020) FCI Fort Dix warden David Ortiz stated: "Social distancing is not possible in this environment" [See: Exhibit 5]

In another memo dated April 16th 2020 addressing the housing unit which held these inmates who have now tested positive for "COVID-19 and have been removed an isolated warning authors stated :cobra 19 is easily transmitted from one person to another it can be transmitted by a person who has no symptoms at all". It is of grave importance for the court to be advised and aware that several inmates who have tested positive one once because in the exact housing unit that Avery is housed in.

The Center for disease control and prevention CDC shows that nearly 40% of all hospitalizations from the coronavirus word 20 to 54 years old an African American are especially vulnerable to COVID-19. Everybody must take every necessary action to protect vulnerable populations and the community at large.

Conditions at Fort Dix create the ideal environment for the transmission of the contagious disease [see linked photos from Fort Dix federal prison in New Jersey raise major questions about safety and health concerns YouTube link].

Residence circle in and out of the prison from all over the outside, and people who work in the facilities leave and return daily, without screening.

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situation', And may also be less able to participate in proactive measures to keep themselves safe" "Infection control is challenging and these settings".

In the declaration of doctor Jamie Meyer pursuant to 28 USC 1746 an Associate Professor of medicine at Yale School of Medicine And assistant clinical professor of nursing at Yale School of Nursing Board Certified in Internal medicine infectious disease also whom has worked for over a decade on infectious disease in the context of jails and prisons reported.

There is a "heightened risk of epidemic in jails and prisons" for the reasons set forth: "The risk posed by infectious disease in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure and harm to individuals who become infected. Prison health it's public health.

Reduce prevention opportunities: "Congregated settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passes by droplets through coughing and sneezing ". when people must share dining Halls, bathrooms, showers comma and other common areas comma the opportunity for transmission or greater. When infections disease is transmitted from person to person by droplets the best strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community Spaces within jails and prisons are often also poorly ventilated, which promote highly efficient spread of

13

.sease through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to an acquiring infectious disease.

Juxtaposing doctor Myers declaration on this point with the conditions presented at FCI Fort Dix clearly reveals that Fort Dix is an ideal environment that foster the spread of COVID-19. Fort Dix has a "congregated setting" that prohibits Avery's ability to protect himself by "social distancing ". Warden David Ortiz acknowledged this fact [See: Exhibit Supra]

Because COVID-19 is transmitted person to person especially through droplets from coughing and sneezing the mere fact that Avery is forced to share (21) toilets, (9) urinals, (13) showers [none of which are clean after each use] and are all in ill repaired conditions See:[Exhibit Supra] coupled, with the fat Avery is also forced to share (11) computers an (8) telephone to communicate with his family and friends which are all shared between 350 other inmates only result in a greater opportunity to contact and transmit COVID-19 at a higher percentage rate.

The ventilation system at Fort Dix FCI has been so can compromise as to render it nonexistent. Spaces "poorly ventilated:" "promote highly effective spread of disease through droplets". Thus, "therefore dramatically reduces their ability to protect themselves from being exposed 2 an acquiring infectious disease. "

Doctor Jaimie Myers declaration further declared: "jails and prisoners are often poorly equipped to diagnose and manage infectious disease outbreaks: some jails and prisoners lack on site medical facilities or 24 our medical care period the medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplets borne infectious disease, people who are infected an ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms, if any comma and those may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the Illness and caring for those who have become infected much more difficult.

Juxtaposing here reveals several key and major concerns namely, FCI Fort Dix is insufficiently equipped to handle a large outbreak, in a recent turn of events four Fort Dix in its last minutes desperate

14

attempts to prevent transmission of this droplet borne infectious disease has now reopened housing unit 5803 a unit merely 90 days pass was ruled as unsafe, unhealthy, unsanitary and rippled with hazardous living conditions. 5803 just 90 days pass was empty of all staff and inmates alike, no repairs were made to 5803 yet Fort Dix has reopened that unit, further exposing inmates to living conditions that foster the spread of COVID-19.

### *Circumstances Have Changed for the Worst at FCI Fort Dix.*

FCI Fort Dix is one of the facilities that in experiencing an exponential increase in infection from COVID-19. On March 21, 2020, 30 days ago, the BOP announced its first reported inmate case of COVID-19. As of May 10, 2020, the BOP has over 3,580 positive cases of COVID-19; over 3,330 among inmates and over 250 among staff. 46 inmates and BOP staff members have died of the illness. The increase in BOP cases over the past few weeks represents a terrifying epidemic curve. And even these numbers are almost certainly an undercount, because there is almost no testing being conducted at the most seriously affected sites, such as FCI Fort Dix, which has the largest federal inmate population in the United States.

On March 31, 2020, the BOP mandated certain cleaning measures and issuance of protective gear. See; Bureau of Prisons implementing Modified Operations. But these measures simply haven't flattened the curve for those inside the institutions' walls.

Avery began drafting his Compassionate Release Motion in early April. On the day Avery did so, FCI Fort Dix had 2 positive cases. On April 20, there were 24 positive cases, an increase of 1200%. And even these numbers are almost certainly an undercount, because there is almost no testing being conducted at FCI Fort Dix. Attorney General Barr has recognized that FCI Fort Dix, where Avery is housed, is one of the federal prisons affected by COVID-19, and that the virus is an "emergency condition" that is "materially affecting operations" in that facility. At the time of this writing, according to the BOP's public website, 40 inmates and 4 staff members at FCI Fort Dix have tested positive for COVID-19. The virus thrives in densely packed

populations. FCI Fort Dix has proven that it is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Avery.

Avery wants this Court to be aware of this simple fact that the BOP website's COVID-19 results are grossly undercounted. Reports from FCI Fort Dix Food Service workers, who are responsible for the preparation of meals provided for both those inmates who have tested positive for COVID-19 and who are placed in quarantine because they have developed symptoms consistent with COVID-19, report the positive inmate number is 40, and the quarantine number is 61, with many of those inmates formerly housed in Avery's housing unit.

Conditions at FCI Fort Dix are especially dangerous. These conditions led the ACLU to file a habeas petition on behalf of FCI Fort Dix inmates. See Wragg v. Ortiz, 20-cv-5496-RMB (DNJ). [The case was dismissed on jurisdictional grounds without factual findings.]

The lawsuit detailed the significant failings of the institution to protect the inmates from the threat of coronavirus. Petitioners submitted a declaration from Joe Goldenson in support of their application. Dr. Goldenson detailed the enhanced risk of infection generally in correctional facilities. He notes, "Close, poorly ventilated living quarters and often overcrowded conditions in these facilities foster the rapid transmission of infectious disease particularly those transmitted by airborne droplets through sneezing, speaking, or coughing." Specific to Fort Dix, he mentions that the "detainees share restrooms and shower facilities and eat communally prepared food."

Additionally, he observes that "adequate social distancing would be impossible to achieve." Fort Dix also suffers from a failure to systematically test prisoners for COVID-19, and failure to give test results of any tested inmates. See Petitioners' Response to Court's Amended Supplemental Text Order, Wragg v. Ortiz, 20-cv-5496-RMB (DNJ), ECF No. 49 at 3. The facility also lacks any contact tracing within the facility for staff members who test positive. Id.

16

Nina H. Fefferman, Ph.D. Professor of Mathematical and Biological Synthesis at the University of Tennessee-Knoxville, added that as of April 29, 2020, the rate of COVID-19 infections at Fort Dix was "approximately 14 times that for New Jersey as a whole." See Fefferman Decl., Wragg supra, ECF No. 1-2 at 16.

Avery is currently housed in a 12-person cell. Social distancing is not possible. Adequate soap for hand washing is not available. Personal protective equipment is not distributed. Commonly touched surfaces are not cleaned. The risk of Avery contracting a serious case of coronavirus is high.

### *Avery's reentry plans are verifiable*

Attorney general William Barr issued a memo which outlined eligibility for early home confinement. Barr's memo specified what the BOP should consider in making its decision: [Here Avery will address each requirement] inmates age vulnerable to COVID-19 under Center for Disease Control and prevention CDC guidelines; Avery is an African American (45) years of age. (CDC) report finds African-Americans are especially vulnerable to COVID-19" Furthermore the Center for disease control and prevention CDC shows that nearly 40% of patients hospitalize from Coronavirus were 20 to 54 years old.

The inmate security level, with priorities given to inmates residing in low and minimum-security facilities; Avery is currently housed at Fort Dix FCI which is a low security United States federal prison for male offenders in New Jersey.

The inmates conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment; Avery is A low security inmate with clear conduct. Avery is not a member of any gangs and has not engaged in any violent conduct.

The inmates pattern score, with inmates who have anything above a minimum score not receiving priority treatment; Avery's Pattern score falls between the range if (11-33) which yields a Pattern score level (low) [see: Exhibit 6]

Whether the inmate has a "demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a low risk of contracting COVID-19 the inmate would face in his or her BOP facility."

Avery is an aspiring minister of the Christian Faith he was ordained a minister under the Universal Life Church in (2007). Avery now is a minister of Fresh Oils ministry under Pastor and Founder A. Croskey [see: Exhibit 7] upon release Avery will be mentored and counseled by Pastor Croskey and work as a motivational speaker and Minister for Fresh Oils Ministry. Avery also plans to further his paralegal efforts by joining "Keiser University Online/paralegal studies program) 888- 922-3998" Avery will also be mentored and tutored by Leticia Maria Ramirez, former step mother (see: Exhibit 8). Avery is a Technical Analysis under Brielle George (IBO) for the Foreign Exchange Market (Fed ex) Avery will working for Brielle George as an ( FedEx) marketer [see: Exhibit ____] this is done via laptop computer  Avery also has taken up real estate courses and has been in constant contacting working with Mr. Weeks building Avery's portfolio which Avery plans to take full advantage of upon transfer [ see: Exhibit 9].

Upon the Court granting of Avery's application Avery will be living with his father, Mr. C. Avery at 920 Metcalf Avenue Mr. Avery lives alone and is not positive for COVID-19, Mr. Avery will ensure that Avery is picked up and drives directly to 920 Metcalf within an hour and a half of the court order to transfer Avery to home confinement. Fort Dix has had (18) confirmed cases and is in an ill repaired condition that foster the spread of COVID-19, thus 920 Metcalf Avenue, Apt 10J, Bronx, NY 10473 presents a lower risk of contracting COVID-19 than Fort Dix (FCI).

The inmate's crime of conviction, and an assessment of the danger present by the inmate to the community; Avery is a non-violent drug offender convicted of 814) (b)(1) (c).

The inmate served 50% or more of their sentence; Or have 18 months or less remaining on their sentences and have served 25% or more of their sentence: Avery was sentence to 108 months one consecutive to 12 months for revocation violation [note: The Second Circuit Court of Appeals vacated Avery's revocation sentence]

18

Therefore Avery is now serving 108 months of which Avery has already served 66 months which results in 61.2% of his time and this percent is not including Avery's good time credit nor halfway house credit.

The current pandemic caused by the spread of COVID-19 give rise to the serious concerns for those serving the remainder of their sentence at low security prisons, camps and halfway houses, that have dormitory style housing with social distancing, as the warden of Fort Dix FCI David Ortiz states "is possible". COVID-19 spreads mainly between people who are in close contact with one another (within about 6 feet) Through respiratory droplets produced when an infected person coughs or sneezes. Individuals who contract the virus may not show symptoms for 10-12 days, but they are still contagious whom they interact. This asymptomatic transmission "makes the virus unusually dangerous as carriers can be unaware of their own infection. It is for this reason that given our lack of any cure or vaccine, social distancing is the only method by which to slow the spread of COVID-19.

Globally, "social distancing" is mandated and mandatory, because prisons and jails are not isolated from communities. It is Avery's fear that when the economy is re-opened and people resume their normal lifestyles as in visiting local bars, movie theatres, amusement parks etc. The United States will experience similar catastrophic effects as did China (China rescinded their social distancing mandate which resulted in the return of COVID-19 in a stranger form).

This will only raise the possibility of a super outbreak of the contagious COVID-19 in Fort Dix, FCI because staff, visitors, contractors and vendors Pass between communities and facilities and can bring infectious disease into facilities.

Social distancing and staying at home are particularly vital because studies suggest that coronavirus (including preliminary Information on the COVID-19 virus) may persist on surface is for a few hours or up to several days. "According to a recent study published in the ***New England Journal of medicine***, SARS-Cov-2 The virus that causes COVID-19, can live in the air an on surface is between several hours and several days. The study found that the virus is unable for up to 72 hours on plastics, 48 hours on stainless steel, 24 hours on Cardboard comma and four hours on copper. It is also detectable in the air for up to three hours. Hence the rapid

19

spread of COVID-19 can result from the fomites (objects or materials that are likely to carry infections) such as elevator buttons common restroom taps and clothes.

Troubling is one of Fort Dix FCI preventive measures in which Fort Dix elected to house its inmates who have tested positive for COVID-19 and housing unit 5851. This election is troubling because 5851 is also used as the laundry housing unit [where inmates "clothes" are washed and stored] Furthermore clothing exchange items are stored in 5851 such as towels, washcloths, blankets, pillows, sheets etc. "The rapid spread of COVID-19 can result from fomites (Objects or materials that are likely to carry infections.) Such as "close ". COVID-19, can live in the air and on surfaces between several hours and several days.

Some Federal Judges have begun taking action in light of the extraordinary damager inmates face in BOP facilities. Judge Nathan reversed her prior denial of bail, citing the high risk of COVID-19 infection in jails. [Since the March 6 hearing, the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent.  United States v Stephens, No. 15 cr-95 (AJN), 2020 U.S. Dist. Lexis 47846, at 3-5 (S.D.N.Y March 18, 2020). United State v. Resknik No 1:12 - cr- 00152 cm (S.D.N.Y. April 2, 2020), United State v. Separta (No. 18 – cr -578) (SDNY April 20, 2020), United States v. Asaro (No. 17 – cr – 127) (Apr) (EDNY April 20, 2020) and United States v. Bess (No. 16 – cr – 156) (WDNY April 21, 2020)

The conditions for residents of Fort Dix create a grave risk of exposure to COVI-19.  The inmates are not allowed to use any alcohol-based hand sanitizers, which is currently the most effective way to sanitize hands and surfaces.  On a daily basis, Avery is forced to have close proximity with 350 inmates housed in his unit and with several staff members that rotate housing unit neglecting to protect themselves and others by wearing a mask and gloves, thereby increasing Avery's risk of being infected.

Avery's exposure to this deadly virus is a virtual certainty.  Unquestionably, the risk of transmission to and from Avery is exponentially greater at Fort Dix that if Avery served the remainder of his sentence on home confinement.  These risks are especially serious because Avery is African American and "African Americans are especially vulnerable to suffering from COVID-19." and more vulnerable to suffering from severe symptoms and death if he contracts COVID-19.

20

Home confinement is not release, home confinement is transfer and still apart of being in BOP custody and control. Transfer to home confinement will promote "social distancing" that saves lives by reducing transmission. By permitting Avery to move to home confinement earlier, the risk that Avery will contract COVID-19 from other inmates, many of whom are currently sick (likely with COVID-19) is eliminated. Finally, Avery is willing to implement any additional measures deemed necessary to reassure the Court and the Bureau of Prisons of his whereabouts and compliance with his sentence, including but not limited to, continuing to be financially responsible for his "subsistence fees" at the RRC( halfway house) and wearing an ankle monitor.

Accordingly, Avery respectfully request this Honorable court to modify and/or reduce Avery's sentence so that Avery may be immediately transferred by the BOP to home confinement.

## EXHAUSTION SHOULD BE EXCUSED AS FUTILE AND BECAUSE DOING SO WILL CAUSE IRREPRABLE INJURY

Due to the recent enactment of 18 USC Section 3582[c] (1) (A) (i) as part of the First Step Act, there is virtually no case law interpreting the exhaustion requirement. However, in general, "exhaustion of administrative remedies is required" for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant relief requested conserves judicial resources: and their own errors fosters administrative autonomy." Moscatto v FBOP, 98 F.3d 757, 761-63 (3rd Cir. 1996)

Courts, however, have excused exhaustion when it would not promote these goals. See; e.g. Gambino V Morris, 134 F.3d 156, 171 (3rd Cir. 1998) (Roth concurring) (exhaustion excused upon petitioner showing futility); Carling v Peters No. civ. A oo-CV-2958, 2000 U.S. Dist. Lexis 10288, WL 1022959 at 2 (E.D. Pa July 10, 2000) (exhaustion excused where delay would subject petitioner o irreparable injury); and Lindsay v Williamson, 2007 US Dist. Lexis 54310 at 6-7(MD Pa. 2007). Additionally, courts have found that despite exhaustion requirement, they may issue Order under the above circumstances," because the exhaustion doctrine is based upon comity and not jurisdiction:, Williamson v James, 770 F. Supp 103, 106 ( WDNY 1991)( citing Wheeler v Kelly, 639 F. Supp 1374, 1377 ( EDNY 1986) aff'd 811 F. 2d 133 (2d Cir. 1987).

21

Additionally, several federal appellate courts, in interpreting a different portion of 18 USC Section 3582 [c] have held that the language of that subsection is non-jurisdictional. United States v Taylor, 778 F.3d 667,671 [7th Cir. 2015]("Section 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment......nor is subsection (c) phrased in jurisdictional terms"); see also United States v Colton, 900 F.3d 706, 711 (5th Cir. 2018) ( citing United States v Caraballo-Martinez, 866 F.3d 1233,1243 ( 11th Cir. 2017);United States v Anderson, 772 F.3d 301, 662 ,667 (11th Cir. 2014); United States v Beard 745 F.3d 288,291 (7th Cir. 2014); United States v Trujillo, 713 F. 3d 1003, 1005  (9th Cir. 2013) see also United States v Green, 886 F.3d 1300,1306 (10th Cir. 2018).

Accordingly, §(c) should not be understood to impose jurisdictional requirements. While prior cases governing compassionate release under earlier versions of the state may create an ongoing requirement that defendants request that the BOP file compassionate release motions before filing on their own, the waiting period cannot be understood as a jurisdictional requirement.  Here, Avery submits that the Court may order the requested sentence modification without requiring Avery to exhaust his administrative remedies because exhaustion would be futile and because it would cause yeah irreparable injury as discuss above.

### *Personal Statement*

[See: Exhibit 12]

### *Conclusion*

For the foregoing reasons Avery respectfully request this honorable court to modify Avery sentence so that Avery will be immediately transferred and placed on house confinement. Avery submits that this is the appropriate and human approach to dealing with this pandemic and the global emergency of this magnitude.

*Dated:*

Dorian Avery 51830083
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

22



BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Case Manager Vogt | DATE: 4-20-2020 |
|---|---|
| FROM: Dorian Avery | REGISTER NO.: 51830-083 |
| WORK ASSIGNMENT: N/A | UNIT: 5802 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

I Am writing to Apply for Compassionate Release pursuant to the First Step Act and/or the Cares Act due to the COVID-19 outbreak here At Fort-Dix (FCI) I Am A Non-violent offender with 50% of my time Served, Moreover, I would like this request and response to represent the full exhaustion of ALL required administrative remedies do to the time Sensitive nature of this matter, thus allowing the District Court to consider and move on my motion for a Sentence Modification for Home Confinement

Thank you

(Do not write below this line) Dorian Ay

DISPOSITION:

In order to qualify, an individual cannot have any history of violence As you have a violent conviction, you do not qualify.

| Signature Staff Member | Date 04-20-2020 |
|---|---|

Record Copy - File; Copy - Inmate

PDF                                    Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER        **SECTION 6**

"Exhibit 1-A"

**Avery, David**
Register Number: 51830-083
Unit 5802

## INMATE REQUEST TO STAFF RESPONSE

This is in response to your request for consideration for
Compassionate Release/Reduction in Sentence (RIS) in accordance with
18 U.S.C. §3582(c)(1)(A) and Program Statement 5050.50, Compassionate
Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C.
§3582(c)(1)(A) and §4205 (g).

In accordance with Program Statement 5050.50, Compassionate
Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C.
§3582(c)(1)(A) and 4205 (g), an inmate may initiate a request for
consideration only when there are particularly extraordinary or
compelling circumstances which could not reasonably have been foreseen
by the court at the time of sentencing.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a
sentencing court, on motion of the Director of the BOP, to reduce a
term of imprisonment for extraordinary or compelling reasons.  BOP
Program Statement No. 5050.50, Compassionate Release/Reduction in
Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A)
and 4205(g), provides guidance on the types of circumstances that
present extraordinary or compelling reasons, such as the inmate's
terminal medical condition; debilitated medical condition; status as a
"new law" elderly inmate, an elderly inmate with medical conditions,
or an "other elderly inmate"; the death or incapacitation of the
family member caregiver of the inmate's child; or the incapacitation
of the inmate's spouse or registered partner.  In addition, order to
properly review your request, please assure you include your release
plan (employment, medical, financial).

If you still wish to be considered for Compassionate Release/RIS,
please re-submit your request with the one specific category, as well
as a detailed release plan.


If you are dissatisfied with this response, you may appeal the
decision through the Administrative Remedy process.


M. Bridges                                    5/18/2020
Executive Assistant                           Date




"Exhibit 1-B"

**Submitted to Prison Staff on:**
May / 13 / 2020

## Request to Warden for Compassionate Release

May / 13 /2020
(Month)        (Day)

Dear Warden DAuid Ortiz :
(Warden's Last Name)

My name is Dorian Avery and my Register No. is 51830-083 . I am writing to respectfully request that I be considered for an early release from prison under the Compassionate Release Program, under 18 U.S.C. § 3582(c)(1), and that you treat this as a formal request for a reduction in sentence (RIS).

I believe I am a good candidate for Compassionate Release for the following reasons. I have been incarcerated since Dec. 11, 2014 . I am currently 45 -years-old.

Since I have been incarcerated, I have received the following medical treatment: regular Evaluations to check my high-blood presure and high cholesterol

My current physical and mental health problems include: high blood presure high cholesterol, chronic back and knee pain, obesity, depression and anxiety

I take the following medications: _____

I believe I am (or a family member who needs my care is) at high risk of complications from COVID-19 because my mother and father suffer from heart issues my father recently had heart surgery and is in recovery stages .

Other information that makes me a good candidate for compassionate release includes: My mother has medical issues and can't full take care of herself. My brother takes care of both our parents but needs more help .

When I am released from prison, I plan to live with my father Carter Avery Sr. at his house 920 metcalf Ave, Bronx NY. 10473 .

Based on the information above, given my personal circumstances and the COVID-19 pandemic, I request early release under the Compassionate Release Program.

Thank you for your time and consideration.

Dorian Avery , Register Number: 51830-083
Dorian Avery
(Full name)

"Exhibit 1-c"

| Register Number: | 51830-083 | Date: 4/28/20 | | | |
| Inmate Name: | Dorian Avery | | | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| 1. Current Age | > 60 | 0 | | 0 | |
| | 51-60 | 7 | | 4 | |
| Click on gray dropdown box to select, then click on | 41-50 | 14 | | 8 | |
| dropdown arrow | 30-40 | 21 | 14 | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| 2. Walsh w/Conviction | No | 0 | | 0 | |
| | Yes | 1 | 0 | 0 | |
| 3. Violent Offense (PATTERN) | No | 0 | | 0 | |
| | Yes | 5 | 0 | 5 | |
| 4. Criminal History Points | 0 - 1 Points | 0 | | 0 | |
| | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | | 8 | |
| | 7 - 9 Points | 24 | 24 | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| 5. History of Escapes | None | 0 | | 0 | |
| | > 10 Years Minor | 2 | | 1 | |
| | 5 - 10 Years Minor | 4 | 0 | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| 6. History of Violence | None | 0 | | 0 | |
| | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | 0 | 3 | |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| 7. Education Score | Not Enrolled | 0 | | 0 | |
| | Enrolled in GED | -2 | -4 | -1 | |
| | HS Degree / GED | -4 | | -2 | |
| 8. Drug Program Status | No DAP Completed | 0 | | 0 | |
| | NRDAP Complete | -3 | -3 | -1 | |
| | RDAP Complete | -6 | | -2 | |
| | No Need | -9 | | -3 | |
| 9. All Incident Reports  (120 months) | 0 | 0 | | 0 | |
| | 1 | 1 | 1 | 1 | |
| | 2 | 2 | | 2 | |
| | > 2 | 3 | | 3 | |
| 10. Serious Incident Reports  (120 months) | 0 | 0 | | 0 | |
| | 1 | 2 | | 2 | |
| | 2 | 4 | 2 | 4 | |
| | > 2 | 6 | | 6 | |
| 11. Time Since Last Incident Report | 12+ months or no incidents | 0 | | 0 | |
| | 7-12 months | 2 | | 1 | |
| | 3-6 months | 4 | 0 | 2 | |
| | <3 | 6 | | 3 | |
| 12. Time Since Last Serious Incident Report | 12+ months or no incidents | 0 | | 0 | |
| | 7-12 months | 1 | | 2 | |
| | 3-6 months | 2 | 0 | 4 | |
| | <3 | 3 | | 6 | |
| 13. FRP Refuse | NO | 0 | | 0 | |
| | YES | 1 | 0 | 1 | |
| 14. Programs Completed | 0 | 0 | | 0 | |
| | 1 | -2 | | -1 | |
| (LAST 12 MONTHS) | 2 - 3 | -4 | -4 | -2 | |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| 15. Work Programs | 0 Programs | 0 | | 0 | |
| | 1 Program | -1 | 0 | -1 | |
| | >1 Program | -2 | | -2 | |
| Total Score (Sum of Columns) | | General: | 30 | Violent: | |
| General/Violent Risk Levels | | General: | | Violent: | |
| OVERALL MALE PATTERN RISK LEVEL | | | | | |

"Exhibit 1-D"

10 OR BELOW — MINIMAL
11 — 33     — LOW
34 — 45     — MEDIUM
46 OR MORE  — HIGH

## NOTICE TO THE INMATE POPULATION

**DATE:**          April 11, 2020

**FROM:**          D. Ortiz, Warden

**SUBJECT:**       Protecting Yourself and Others

In order to maintain the health of staff and inmates, the following is expected from ALL inmates:

- Wash hands with soap and water for at least 20 seconds.
- Avoid touching your eyes, nose, and mouth with unwashed hands.
- Clean and disinfect all surfaces with the approved chemical.
- Cover your cough/sneeze with tissue, immediately throw tissue in the trash and wash your hands.
- **Wear your surgical face masks!** Since Social Distancing is not possible in this environment, masks will help keep you and others from spreading viruses.
- Report symptoms (coughing, sneezing, fever, fatigue, etc.)to Health Services and/or any staff.

We ALL must do our part in protecting ourselves and others from spreading COVID-19!

"Exhibit 1-E"

FERNANDEZ, JUAN 87850054



Exhibit 2A



"Exhibit 2B"



"Exhibit 2C"



"Exhibit 2D"



"Exhibit 2E"



"Exhibit 2F"



"Exhibit 26"



"Exhibit 2H"



" Exhibit 2I"



" Exhibit 2υ "



" Exhibit 2-K "



"Exhibit 2-L"



"Exhibit 2-M"



" Exhibit 3 "



"Exhibit 4"

## NOTICE TO THE INMATE POPULATION

DATE:            April 11, 2020

FROM:            D. Ortiz, Warden

SUBJECT:         Protecting Yourself and Others

In order to maintain the health of staff and inmates, the following is expected from ALL inmates:

- Wash hands with soap and water for at least 20 seconds.
- Avoid touching your eyes, nose, and mouth with unwashed hands.
- Clean and disinfect all surfaces with the approved chemical.
- Cover your cough/sneeze with tissue, immediately throw tissue in the trash and wash your hands.
- **Wear your surgical face masks!** Since Social Distancing is not possible in this environment, masks will help keep you and others from spreading viruses.
- Report symptoms (coughing, sneezing, fever, fatigue, etc.)to Health Services and/or any staff.

We ALL must do our part in protecting ourselves and others from spreading COVID-19!

FERNANDEZ JUAN 5?6690?

"Exhibit 5"

| | | SCORE | Score | SCORE | Score |
|---|---|---|---|---|---|
| 1. Current Age | > 60 | 0 | | | |
| Click on gray dropdown box to select, then click on dropdown arrow | 52-60 | 2 | | | |
| | 41-51 | 8 | 14 | | |
| | 36-40 | 14 | | | |
| | 28-35 | 21 | | | |
| | < 28 | 28 | | | |
| 2. Walsh w/Conviction | No | 0 | 0 | | |
| | Yes | 3 | | | |
| 4. Violent Offense (PATTERN) | Yes | 3 | 0 | | |
| | No | 0 | | | |
| 4. Criminal History Points | 0 | 0 | | | |
| | 0 - 1 Points | 1 | | | |
| | 2 - 3 Points | 3 | | | |
| | 4 - 6 Points | 6 | 24 | | |
| | 7 - 9 Points | 16 | | | |
| | 10 - 12 Points | 24 | | | |
| | > 12 Points | 32 | | | |
| 5. History of Escapes | None | 0 | 0 | | |
| | > 10 Years Minor | 1 | | | |
| | 5 - 10 Years Minor | 4 | | | |
| | < 5 Years Minor/ Any Serious | 5 | | | |
| 6. History of Violence | None | 0 | | | |
| | > 10 Years Minor | 1 | 0 | | |
| | > 15 Years Serious | 2 | | | |
| | 5 - 10 Years Minor | 3 | | | |
| | 10 - 15 Years Serious | 4 | | | |
| | < 5 Years Minor | 5 | | | |
| | 5 - 10 Years Serious | 6 | | | |
| | < 5 Years Serious | 7 | | | |
| 7. Education Score | Not Enrolled | 0 | -4 | | |
| | Enrolled in GED | 0 | | | |
| | HS Degree / GED | 0 | | | |
| 8. Drug Program Status | No DAP Completed | 0 | -3 | | |
| | No DAP Compliant | -5 | | | |
| | RDAP Compliant | -6 | | | |
| 9. All Incident Reports (120 months) | No Need | 0 | | | |
| | 0 | 0 | | | |
| | 1 | 1 | 1 | | |
| | 2 | 2 | | | |
| | > 2 | 3 | | | |
| 10. Serious Incident Reports (120 months) | 0 | 0 | | | |
| | 1 | 1 | | | |
| | 2 | 2 | 2 | | |
| | > 2 | 4 | | | |
| 11. Time Since Last Incident Report | 12+ months or no incidents | 0 | | | |
| | 7-12 months | 2 | 0 | | |
| | 3-6 months | 4 | | | |
| | < 3 | 6 | | | |
| 12. Time Since Last Serious Incident Report | 12+ months or no incidents | 0 | | | |
| | 7-12 months | 1 | 0 | | |
| | 3-6 months | 2 | | | |
| | < 3 | 3 | | | |
| 13. FRP Refuse | NO | 0 | 0 | | |
| | YES | 1 | | | |
| 14. Programs Completed (LAST 12 MONTHS) | 0 | 0 | | | |
| | 1 | -2 | | | |
| | 2 - 3 | -4 | -4 | | |
| | 4 - 10 | -6 | | | |
| | > 10 | -8 | | | |
| 15. Work Programs | 0 Programs | 0 | 0 | | |
| | 1 Program | -1 | | | |
| | >1 Program | -2 | | | |
| **Total Score (Sum of Columns)** | | General: | 30 | Violent: | |
| **General/Violent Risk Level** | | General: | | Violent: | |
| **OVERALL MALE PATTERN RISK LEVEL** | | | | | |

10 OR BELOW — MINIMAL
11 - 33 — LOW
34 - 45 — MEDIUM
46 OR MORE — HIGH

" Exhibit 6 "



May 19, 2020

To Honorable Jesse Furman:

It is my pleasure to write this letter of reference for Mr. Dorian Avery 51830-083, who is like a younger brother to me. I have known Mr. Avery for the last 8 years and he has always had a drive to become a successful person. He has a very sweet personality and I believe that at this present time in his life that he has learned a valuable lesson.

I am writing this letter on his behalf because he has spoken to me on several occasions about his concern that he become a productive member of society when released. I have heard his pains in growing up in an underprivileged community that was drug infested and had some of the worst schools in the country. I have had the privilege to work in the prison systems for over 15 years to help inmates to address their issues and to become productive members of society. I am writing this letter in order that you may know that I am willing to support Mr. Avery in all his endeavors to become a positive citizen in the community in which he will live and serve. He has been in a loving and supportive relationship with his parents and daughter. I am willing, along with other members of my church, to be supportive to Mr. Avery, spiritually, emotionally and physically. He will be given the opportunity to volunteer at the facility (163 St Nicholas Ave NY.NY 10026) in which we have several outreach opportunities. I am also in the midst of starting a support group for people who were formerly incarcerated. If given the opportunity, I believe with all my heart the Mr. Dorian Avery will do all that he can to be supportive of his family and his new life of living without criminal activities. I am willing to help him get his life on the right track.

At the present time I have concerns about Mr. Avery due to the corona virus, and how his incarceration puts his life at a great risk, both physically and mentally. Your Honorable Jesse Furman, I would appreciate any consideration on the matter and life of Mr. Dorian Avery.

If any information is needed, please contact me at Fresh Oils Ministries located at 163 St Nicholas Ave New York City NY 10026. 718-753-1441 Attn: Pastor Adrienne Croskey,

Once again thank you for your time.

Sincerely, Pastor A Croskey

"Exhibit I"

Leticia Maria Ramirez
4523 Broadway
New York, New York 10040

Judge Jesse M. Furman
United States District Court
Southern District of New York                              May 18, 2020

I am submitting this letter in support of my former stepson, Dorian
Avery.

It has come to my attention, that Dorian may be released from federal
prison, based upon safety concerns surrounding the Coronavirus
pandemic. Dorian has informed me that he wishes to enroll in a
paralegal course, as he has been assisting other individuals who are
incarcerated with their legal work.

As someone who is well versed in the law, I intend to serve as a mentor
to Dorian, assisting him with his studies, and helping him navigate the
various areas of the law of which he must become proficient in.

I have reviewed previous work done by Dorian and truly believe that he
has the intellect and work ethic to do well with a paralegal degree.  I
have many friends who are attorneys and will do my best to help him
find employment upon his completion of his paralegal course.

Should you have any questions or concerns, please feel free to contact
me at the number listed above.

Thank you so much for your consideration of Dorian's request for
release.

Sincerely,

Leticia M Ramirez

"Exhibit 8"

April 30, 2020

To whom it may concern:

Re:   Dorian Avery

I'm writing this letter on behalf of Mr. Dorian Avery.  I've had the pleasure of
exchanging correspondence with Mr. Avery over the past couple of years, as he is
very interested in the real estate work that my partner and I do.  I've discussed our
business and company at length with Mr. Avery, and I have extended an opportunity
to learn and develop his professional skills within our organization upon his release.
My hope is that our commitment will help propel Mr. Avery to long-term success in
the future.

Thank you again for your consideration.  If you have any questions or need additional
information, please call me at 757-342-8166.  I will be happy to speak with you.

Sincerely,

Hosh Weekes
Principal
Ungentrified, LLC
Hosh.weekes@consultant.com
757-342-8166

Copy to: Dorian Avery

"Exhibit 9"

Carter Avery
920 Metcalf Avenue, Apt. 10J
Bronx, NY 10473
646-872-2387 Cell

July 10, 2020

Re: Dorian Avery 58130083

District Court Judge Hon. Jesse M. Furman
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

I am submitting this letter in support of an application for modification of sentence for my son, Dorian Avery 51830083. There still exists a heightened concern that the Covid-19 virus will continue to spread among federal prisoners because of the inherent inability to socially distance in any facility in the federal prison system.  If Dorian's sentence were to be modified, to the point of allowing for immediate release, I send you this letter to insure you that he would have the necessary housing and financial support required for a successful transition to life in the community.

I respectfully submit that I will provide all of the necessary transportation, housing support and financial assistance that Dorian will require. Upon release, Dorian will immediately reside at the above address which has been my home for well over 25 years.  I also stand ready, willing and able to personally pick him up from Fort Dix FCI, I owe my own vehicle and I resigned approximately one hour and 30 minutes, and have Dorian self-quarantine for the requisite 14 days period in order to comply with governmental mandates in place, to insure he does not spread the virus. He will be able to maintain the required CDC social distancing, because Dorian and I will be the only residence residing at the above address. He will have access to the basic PPE i.e. (Mask, gloves, soap etc. that he will be able to use).

If you have any questions, please feel free to contact me at the address and telephone number listed above.

Thank you in advance for any and all consideration given to this matter.

Respectfully,

Carter Avery, Sr.

"Exhibit 10"

# Brielle
# George

## IBO

—

**Brielle George**
2410 Frederick Douglass Blvd
New York, NY 10027
212.322.0224
Brielle.k.george@gmail.com

5 MAY 2020

To Whom This May Be Concerned ,

My name is Brielle George and I am currently an Independent Business
Owner within TradeHouse Investment Group. I have been in this
opportunity for going on three months and I have gained the skill of
trading with the help of IM mastery Academy. My investment group was
started in 2017 and since then has produced over 40 plus six figure
earners. I have been in constant communication with Mr. Avery since
coming into this business and look forward to his release to come join me.
The skill of trading in the foreign exchange market can be done and
learned from home and he will have access to 2 streams of income. I have
complete faith that this business will be the business that Mr.Avery will
find joy in for the rest of his life being that this is a business where you
can grow as long as you put in the effort.

Sincerely,

Brielle George

"Exhibit 11"

## *Personal Statement*

Re: Affidavit of FCI Fort Dix (conditions)
To: Honorable Judge J. Furman
From: Dorian Avery
Date: July 30, 2020

Dear Honorable Judge J. Furman,

First, I would like to thank you for reading and considering my pro se motion and taking into account my personal true statements about the conditions here at FCI Fort Dix.

Your Honor, I would like to first say that I take full responsibility for my actions and level of culpability in my case, and always have taken such a view. I ask that you don't take my pro se motions as a measure in any way to undermine or minimize my full acceptance of responsibility. With this being said, let's not review the conditions that I am actually living in here at FCI Fort Dix.

Your Honor, I was always taught that, "A picture is worth a thousand words," and the pictures attached to my pro se motion speak volumes. Those pictures reveal the reality of the conditions I am forced to live in and with. The showers are cleaned every other day, they are riddled with mold and bacteria, and the toilets and sinks are even worse, but what do you expect when three bathrooms are used by nearly 100 inmates per floor.

Your Honor, the cleaning supplies they give us are virtually useless. This was confirmed by the institution's Captain at a town hall meeting that was held at the beginning of the pandemic's effect on the BOP. At that meeting, Captain Edward Baez told us that, "The supplies we were being given are insufficient to combat COVID-19. The institution is ordering new supplies that kills COVID-19 at a 5% rate higher than other stuff." Your Honor, needless to say, if these new supplies were bought, we did not receive them. We are still given the same cleaning supplies that the institution deemed insufficient.

Your Honor, I know you are hearing conflicted stories about whether or not there are any positive inmates here at Fort Dix. Let me say this. Just because Fort Dix didn't report it, doesn't mean it's not here (that's a trick) ... Your Honor, it's here, and the proof is in the pudding. Let me explain. First of all, a high number of inmates at the Camp were infected, and that's what Fort Dix has reported. What they failed to report is that they took those infected inmates and brought them directly onto the West side compound and placed them in Unit 5851, our laundry supply building, and roughly four to five feet from where we shop for commissary. So, they took what was outside the house and brought it into the living room. This lapse of judgment was then revealed in the following events.

Now Your Honor, we have three quarantine units; 5851, 5803, and the third floor of the medical building, which are now all at the maximum because they have to maintain enough space for social distancing. Simply put, it's not enough space for what's here.

I admit, they use to check our temperature every other day, until two inmates from the West side compound who were in the Special Housing Unit (SHU) tested positive for COVID-19. One was asymptomatic, and the other was full-blown positive. This is what caused medical to fully stop even doing basic temperature checks, because those inmates were in the SHU for two months getting their temperature checked, and then one day, "boom." They didn't report this though. Now we are on our own to fight this virus. Medical doesn't even come around for check-ups anymore. I believe their theory is, "If they fall out, then we will know." That mindset is life-threatening, because I see many inmates displaying signs of COVID-19; but they may just be asymptomatic.

1

As far as testing, I live in a building with nearly 200-plus other inmates, and none, I mean none, have been tested. I requested to be tested and was denied the first time. The second time they didn't even respond to my request.

Your Honor, it's like this. You take your child to a school that is supposed to be a good school. The dean tells you, "Mr. Furman, no one at our school is failing." You respond by asking, "So, what is the average test score?" The dean responds, "Well, we don't actually test the students like that." You reply, "So if you don't test your students like that, then how can you rightfully say no one is failing? Where in fact, I can actually say that you don't have passing students." Then you take your child and go home. Likewise, that's what's happening here. They are not testing, yet saying no one is failing the test, meaning no one is testing positive for COVID-19. Your Honor, this ruse shouldn't be rewarded by keeping me in these conditions. The reality is, Fort Dix can't handle this pandemic, so they resolve to lie and hope no one cares enough to really look.

What about social distancing? As I detailed in my motion, Warden David Ortiz said it himself. "Social distancing is impossible here at Fort Dix." I sent you the memo he put out to the inmate population that said just that.

Your Honor, please excuse so much emotion in my personal true statement. However, I fear for my health and life on a daily basis. All of the lies we are being told is burdensome, and heart and mind-wrecking to say the least.

Your Honor, FCI Fort Dix's plans to keep us safe are not realistically implemented in the ground, and to be honest, are not realistic at all. That's why they either hide the truth or just lie about it all together.

This is the truth: FCI Fort Dix is one compound comprised of a Camp and Low (West and East). The same officers and staff that tend to these infected inmates tend to us via medical, commissary, food service, clothing exchange, laundry, and count times. The same officers enter into each room to count the inmates in all buildings (quarantined or not), and this happens six times per day.

Your Honor, to my understanding, COVID-19 derived from China and has caused a worldwide pandemic. the United States is thousands of miles away from China yet was ravished by COVID-19. So, it's unrealistic to think that the Camp has not impacted the Low, when they are a rock's throw away from each other.

In closing, I want to thank you once again Your Honor for your time in this matter. I pray that you see the truth clearly and save my health and life by granting my motion.

Thank you and God Bless.

Dorian Avery

"Exhibit #12"

2